**O**
**JS-6**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

WILLIAM DOMINICK; and WESTWOOD RARE COIN GALLERY, INC.,

Plaintiffs,

v.

COLLECTORS UNIVERSE, INC.; CERTIFIED ASSET EXCHANGE, INC. a/k/a CERTIFIED COIN EXCHANGE; DAVID HALL RARE COINS; DAVID HALL; CASSI EAST; and MICHAEL BRANDOW; and DOES 1 through 10, inclusive,

Defendants.

Case No. 2:12-cv-04782-ODW(CWx)

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS [50]**

## I. INTRODUCTION

The Defendants in this matter collectively move to dismiss Plaintiffs' Second Amended Complaint ("SAC"). (ECF No. 50.) Having carefully considered the papers filed in support of and in opposition to this Motion, the Court deems the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; L.R. 7–15. For the reasons discussed below, Defendants' motion is **GRANTED**.

## II. FACTUAL BACKGROUND

William Dominick is a full-time professional numismatist and rare-coin dealer who owns Westwood Rare Coin Gallery, Inc. ("WRCG"). WRCG is a New Jersey corporation in the business of selling rare coins, bullion, and other numismatic material[1] in California. (SAC ¶¶ 22, 25, 31.) Both Dominick and WRCG are Plaintiffs in this case.

David Hall is also a full-time professional numismatist and rare-coin dealer. (*Id.* ¶ 38.) Hall wears many hats: he owns David Hall Rare Coins ("DHRC"), a California corporation that deals in rare coins and bullion; he acts as the president, director, and chief executive officer of Collectors Universe, Inc., a Delaware corporation engaged in business in the coin industry; he serves as the director of Certified Coin Exchange ("CCE"), a Delaware corporation owned by Collectors Universe that operates the main website for real-time trading of numismatic materials; and he is a founding member and the chief executive officer of Professional Coin Grading Service ("PCGS"), the service that grades most of the rare coins traded on the CCE website. (*Id.* ¶¶ 40–50, 53–54.) Hall, DHRC, Collectors Universe, and CCE are all named Defendants.[2]

Cassi East and Michael Brandow are additional Defendants in this action. East is CCE's president, while Brandow is CCE's sales director. (*Id.* ¶¶ 57–58.) Hall, East, and Brandow jointly manage CCE. (*Id.* ¶ 129.)

Defendants allegedly engaged in numerous acts to establish their control over the relevant market of real-time trading in numismatic materials and eliminate their competition, including Plaintiffs. Specifically, Plaintiffs take issue with Defendants'

/ / /

---

[1] Plaintiffs define "numismatic materials" as "all types of numismatic material, including bullion, rare coins, certified coins, bags, state quarters, eagles, foreign coins, and ancient currency." (SAC ¶ 108.)

[2] PCGS merged into Collectors Universe in 2008 and is no longer an independent corporate entity. (SAC ¶ 54.)

secret allocation agreement, exclusive-dealing agreement, and certain instances of price fixing.

First, Plaintiffs allege Hall and DHRC entered into a secret allocation agreement with third-party dealers who utilize the CCE website. (*Id.* ¶¶ 114, 159.) According to Plaintiffs, this agreement "constitutes an unreasonable restraint on trade because it secretly divides and distributes the customers on the CCE website primarily among Hall, DHRC and Third Party Dealers, thereby limiting Plaintiffs' access to customers in the market for real-time trading in numismatic materials in the United States." (*Id.* ¶ 161.)

Second, Hall and DHRC allegedly entered into an exclusive-dealing agreement with third-party dealers that afforded Defendants the benefit of a monopoly in the market for rare coins and other numismatic materials. (*Id.* ¶¶ 172, 179.) This agreement prevented Plaintiffs from accessing deals on the CCE website, and even made them the victim of "sham offers" made by Defendants Hall or DHRC, or both. (*Id.* ¶¶ 174–176.) Plaintiffs describe one such sham offer: "Dominick and/or WRCG accepted Hall's and/or DHRC's offer to sell eleven gold commemorative coins on the CCE website, but Hall and/or DHRC only delivered one of the eleven coins . . . because Plaintiffs are not a part of the Exclusive Dealing Agreement [Hall and DHRC] has with other dealers." (*Id.* ¶¶ 175–76.)

Finally, Plaintiffs contend Defendants prepared the CCE price list in a manner that constitutes illegal price fixing. (*Id.* ¶ 162.) Hall, East, and Brandow were responsible for creating the CCE price list, and they selectively decided which prices to disclose and failed to be transparent with how the price list was initially compiled. (*Id.* ¶¶ 168–70.) This created problems because the CCE price list was supposed to accurately provide CCE members and other price-reporting services with "the latest spot metal and bullion coin prices." (*Id.* ¶ 166.)

Plaintiffs additionally allege that Hall engaged in false advertising on the CCE website. Specifically, Plaintiffs contend that Hall falsely claimed that PCGS-graded

rare coins are "valued accurately and impartially" and that rare-coin dealers can become CCE members as long as they fulfill CCE's requirements. (*Id.* ¶¶ 243, 254.) According to Plaintiffs, neither of these statements are true. (*Id.* ¶ 225.)

Following this Court's dismissal of portions of Plaintiffs' First Amended Complaint ("FAC"), Plaintiffs filed their SAC on October 10, 2012. As with the FAC, the SAC asserts nine causes of action: (1) violation of Section 1 of the Sherman Act against Hall and DHRC; (2) violation of Section 2 of the Sherman Act against Hall and DHRC; (3) violation of Section 3 of the Clayton Act against Hall; (4) violation of the Lanham Act against Hall; (5) unreasonable restraint of trade in violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16720, against Hall, DHRC, East, and Brandow; (6) unfair competition in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, against Hall and DHRC; (7) intentional interference with prospective economic advantage against Collectors Universe, CCE, Hall, DHRC, East, and Brandow; (8) negligent interference with prospective economic advantage against Collectors Universe, CCE, Hall, DHRC, East, and Brandow; and (9) breach of contract against Collectors Universe, CCE, Hall, DHRC, East, and Brandow. Defendants filed this Motion to Dismiss on November 12, 2012. (ECF No. 50.)

## III. LEGAL STANDARD

Dismissal under Rule 12(b)(6) can be based on "the lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A complaint need only satisfy the minimal notice pleading requirements of Rule 8(a)(2)—a short and plain statement—to survive a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003); Fed. R. Civ. P. 8(a)(2). For a complaint to sufficiently state a claim, its "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While specific facts are not necessary so long as

the complaint gives the defendant fair notice of the claim and the grounds upon which the claim rests, a complaint must nevertheless "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

*Iqbal*'s plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," but does not go so far as to impose a "probability requirement." *Id.* Rule 8 demands more than a complaint that is merely consistent with a defendant's liability—labels and conclusions, or formulaic recitals of the elements of a cause of action do not suffice. *Id.* Instead, the complaint must allege sufficient underlying facts to provide fair notice and enable the defendant to defend itself effectively. *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The determination whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 566 U.S. at 679.

When considering a Rule 12(b)(6) motion, a court is generally limited to the pleadings and must construe "[a]ll factual allegations set forth in the complaint . . . as true and . . . in the light most favorable to [the plaintiff]." *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001). Conclusory allegations, unwarranted deductions of fact, and unreasonable inferences need not be blindly accepted as true by the court. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). Yet, a complaint should be dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts" supporting plaintiff's claim for relief. *Morley v. Walker*, 175 F.3d 756, 759 (9th Cir. 1999).

As a general rule, leave to amend a complaint that has been dismissed should be freely granted. Fed. R. Civ. P. 15(a). However, leave to amend may be denied when "the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well*

/ / /

*Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir.1986); *see Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

## IV. DISCUSSION

Defendants move to dismiss Plaintiffs' SAC in its entirety. The Court first considers Plaintiffs' federal claims, which include antitrust claims under the Sherman Act and the Clayton Act, as well as a false-advertising claim under the Lanham Act. Because the Court holds that Plaintiffs' federal claims do not contain sufficient factual matter to survive Defendants' Motion to Dismiss, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state-law claims and therefore does not reach those claims on the merits.

### A. Antitrust Claims

Plaintiffs bring antitrust claims alleging (1) unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Section 1"), and the California Cartwright Act, Cal. Bus. & Prof. Code § 16720; (2) actual monopolization in violation of Section 2 of the Sherman Act ("Section 2"); and (3) exclusive dealing in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14 ("Section 3"). As the Court noted in its October 1, 2012 order dismissing Plaintiffs antitrust claims as alleged in the FAC, each of Plaintiffs' antitrust claims require a showing of market power under the rule of reason. (ECF No. 38, at 10–14); *see also Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1044 n.3 (9th Cir. 2008) ("The 'relevant market' and 'market power' requirements apply identically under" Section 1 and Section 2.); *Omega Envt'l, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997) ("The main antitrust objection to exclusive dealing is its tendency to 'foreclose' existing competitors or new entrants from competition in the covered portion of the relevant market during the term of the agreement."). Once again, Plaintiffs have failed to plead market power sufficiently for motion-to-dismiss purposes.

/ / /

/ / /

Market power is defined as having the ability "to force a purchaser to do something that he would not do in a competitive market." *Church & Dwight Co., Inc. v. Mayer Labs., Inc.*, 868 F. Supp. 2d 876, 896 (N.D. Cal. 2012), *vacated on other grounds*, *Church & Dwight Co., Inc. v. Mayer Labs., Inc.*, No. C-10-4429 EMC, 2012 WL 1745592 (N.D. Cal. May 16, 2012). A plaintiff can prove market power either directly or circumstantially. *Id.* Under the direct-evidence test, a plaintiff must allege both restrictive output and supracompetitive prices. *Id.* Restrictive output exists only when a defendant can limit marketwide output by reducing its own output. *Id.* Additionally, "artificially high" prices cannot be equated to supracompetitive prices unless a plaintiff provides evidence to the contrary. *See, e.g.*, *id.* at 14 (stating that when a plaintiff is able to charge similarly high prices, allegations of a defendant's high prices are insufficient to prove supracompetitive prices).

Under the circumstantial-evidence test, a plaintiff must "(1) define the relevant market[;] (2) show that the defendant owns a dominant share of that market[;] and (3) show that there are significant barriers to entry and that existing competitors lack the capacity to increase their output in the short run." *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).

The Court finds that Plaintiffs' allegations satisfy neither the direct-evidence test nor the circumstantial-evidence test. With respect to the direct-evidence test, the SAC still fails to illustrate Defendants' ability to affect the marketwide quantity of rare coins by suppressing their own supply of rare coins—or that Defendants' online trading platform (CCE) could even do so in light of the various other available channels for purchase and sale of rare coins outside the realm of real-time trading on the Internet.

Under the circumstantial-evidence test, Plaintiffs define the relevant market as online "real-time [dealer-to-dealer] trading in numismatic materials in the United States" (SAC ¶¶ 80–81; *see* SAC ¶¶ 51–52, 86–87), and they explain that "[t]he CCE website is the only marketplace for dealers to compete for the real-time sale and

purchase of sight-seen and sight unseen numismatic materials in the United States" (SAC ¶ 52).[3] Assuming the sustainability of the relevant market as Plaintiffs define it (which definition the Court has already held is at least sufficient to survive a motion to dismiss (ECF No. 38, at 10)), Plaintiffs' allegation that CCE is the only dealer in that market suffices to establish the first two elements of the circumstantial-element test (market definition and market share). But Plaintiffs still struggle on the third prong—barriers to competitors' entry into the relevant market.

"A mere showing of substantial or even dominant market share alone cannot establish market power . . . ." *Rebel Oil*, 51 F.3d at 1439. Thus, in addition to defining the relevant market and demonstrating that the defendant owns a dominant share of that market, an antitrust plaintiff must also "show that new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output to challenge" the anticompetitive conduct. *See id.*; *see also United States v. Syufy*, 903 F.2d 659, 664 (9th Cir. 1990) ("A high market share, though it may ordinarily raise an inference of monopoly power, will not do so in a market with low entry barriers or other evidence of a defendant's inability to control prices or exclude competitors.")

Entry barriers may be additional long-run costs not incurred by incumbent firms in the relevant market but that must be incurred by any new entrant into that market. *Rebel Oil*, 51 F.3d at 1439. Alternatively, entry barriers may be "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns." *Id.* (quoting *L.A. Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1427–28 (9th Cir. 1993)). In *Rebel Oil*, the Ninth Circuit identified the "main sources of entry barriers" as:

/ / /

/ / /

[3] Plaintiffs note that there is another online dealer-to-dealer trading platform available in the United States: CoinNet. (SAC ¶ 51.) Plaintiffs distinguish CoinNet from CCE and exclude it from their definition of the relevant market on grounds that it "does not offer real-time trading." (*Id.*)

> (1) legal license requirements; (2) control of an essential or superior resource; (3) entrenched buyer preferences for established brands; (4) capital market evaluations imposing higher capital costs on new entrants; and, in some situations, (5) economies of scale. *Id.*

Here, Plaintiffs allege that the primary barriers to entry into the market for online real-time dealer-to-dealer trading in numismatic materials are CCE's alleged secret allocation agreement and exclusive dealing agreement:

> New rivals in the relevant market for real-time trading in numismatic materials in the United States are barred from entering the market because customers on the CCE website have already been divided and distributed among Hall, DHRC and Third Party Dealers pursuant to the Secret Allocation Agreement, and the Exclusive Dealing Agreement limits the sale of tangible rare coins and other numismatic materials in the United States to Hall, HRC, Third Party Dealers, and no one else. (SAC ¶ 118.)

But these "barriers" are not relevant to entry into the market Plaintiffs defined in this case. The Court does not dispute that the alleged secret allocation and exclusive-dealing agreements could prevent dealers and purchasers of numismatic materials from participating fully in CCE's platform. Yet because Plaintiff define the relevant market as *online real-time numismatic trading platforms*, Plaintiffs antitrust claims do not concern CCE's *users*; they concern only CCE's *competitors* in the market for online real-time numismatic trading platforms—of which Plaintiffs allege CCE currently has none.

Plaintiffs' apparently confuse the nature of their own market definition. Plaintiffs state that the "relevant market is the market for real-time trading in numismatic materials in the United States" and that the "platform for the relevant market is the CCE online trading platform on the internet [*sic*]." (SAC ¶¶ 80, 83.) On this basis, Plaintiffs perfectly equate the relevant market with CCE's customers. But Plaintiffs misunderstand that a market is defined by *products*, not by *users* of those products. Plaintiffs' approach here would be akin to equating Time Warner Cable's

high-speed Internet subscribers with the relevant market for high-speed Internet providers in the Greater Los Angeles Area. Such a market would not include a single provider's *subscribers*, but rather all of the high-speed Internet *providers* in the Greater Los Angeles Area, including Time Warner, AT&T, Verizon, and others. The fact that CCE is currently the only real-time numismatic exchange provider in the market as Plaintiffs define it does not change this fact, as new providers of a reasonably interchangeable service could emerge at any given time, absent significant entry barriers.

Further, to the extent Plaintiffs may contend the alleged secret allocation and exclusive-dealing agreements could somehow preclude new online real-time trading platforms from entering the market to compete with CCE, Plaintiffs plead no facts explaining how this could be. Indeed, one could easily surmise that rare-coin dealers spurned from CCE as a result of its secret allocation and exclusive-dealing agreements could band together and create a comparable real-time trading platform to compete with CCE. This prospect is even more realistic in light of CoinNet's presence in the online dealer-to-dealer market and Plaintiffs' failure to explain even in the broadest terms why CoinNet could not begin offering real-time services with relative ease.

Plaintiffs allege two further entry barriers related to customers of real-time trading exchanges: (1) costs involved in finding customers in the relevant market that are not already covered by the secret allocation and exclusive-dealing agreements (SAC ¶ 119); and (2) access to CCE's customers, which Plaintiffs contend are an "essential resource" that CCE, Hall, and DHRC control (SAC ¶ 121). But there is no indication in the SAC that CCE's customers—the subjects of the secret allocation and exclusive dealing agreements—could not *also* be customers of a new trading platform. Thus, Plaintiffs fail to establish how CCE's alleged division of its own customers would constitute an entry barrier to a firm determined to compete with CCE.

Finally, Plaintiffs allege that Hall's control of PCGS, CCE's primary coin grading service, would pose a barrier to entry into the market for real-time numismatic

exchange services. As with Plaintiffs' other alleged entry barriers, this too fails for its narrow-sighted focus on CCE, as opposed to a potential CCE competitor. While Plaintiffs allege PCGS is *CCE's* primary coin grading service, they do not contend it is the primary (or even just a significant) grading service for the numismatic industry at large. Were this the case, one could presume that Hall's control of both PCGS and CCE may pose an entry barrier to any new CCE competitor, which necessarily would require coin grading services. But the SAC offers no basis by which to draw this inference.

The only *Rebel Oil* entry barrier this Court can detect from Plaintiffs' SAC is the potential for entrenched numismatic-trader preferences for CCE since CCE the only established real-time exchange—a barrier Plaintiffs do not explicitly allege. But even if the Court could infer the existence of such a barrier from the facts alleged in the SAC, the SAC still lacks sufficient facts demonstrating either the depth of any such entrenchment or how big of a role real-time numismatic trading on the Internet plays the broader market for the exchange of numismatic materials generally (as compared to in-person trading and non-real-time trading on the Internet (like CoinNet), for example). Without this context, it is impossible for the Court to discern whether an entrenched preference for CCE could sufficiently preclude entrants into the market for real-time numismatic trading such that CCE could be said to control market power.

Plaintiffs therefore fail to establish any barriers to entry in the relevant market, much less significant ones. Of course, Plaintiffs attempt to avoid this fate with respect to their Section 1 claim by arguing the Court need not even look to relevant market and market power because Defendants' acts are *per se* illegal. To this end, Plaintiffs contend that "[t]he SAC describes two specific agreements Hall and DHRC have with select third party dealers which, individually and collectively, have the effect of restricting a competitor's access to and ability to compete in the relevant market."

/ / /

(Opp'n 9.) Thus Plaintiffs' core complaint is that Defendants secret allocation and exclusive-dealing agreements have forced them out of Defendants' CCE service.

The Court notes again, however (as it did in its October 1, 2012 Order ruling on Defendants' motion to dismiss Plaintiffs' First Amended Complaint), that although Plaintiffs allege price fixing, they still fail to allege sufficient facts demonstrating a clear act of anticompetitive, *per se* illegal price fixing. *See generally Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 103–04 (1984) ("Per se rules are invoked when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct."); *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 361–62 (1982) ("[I]t is . . . well settled that this characterization [of price fixing] is not to be applied as a talisman to every arrangement that involves a literal fixing of prices.").

In sum, the antitrust laws are designed to protect competition, not competitors. *E.g.*, *Syufy*, 903 F.2d at 668. "When competition is impaired, producers may be able to reap monopoly profits, denying consumers many of the benefits of a free market." *Id.* at 663. While this may perhaps have been the case here had Plaintiffs defined the relevant market differently, Plaintiffs are the masters of their complaint and chose to focus on competition between producers of platforms for real-time numismatic trading on the Internet. Having chosen this market and taken three bites at the apple to date, Plaintiffs still have alleged no facts to show how Defendants' actions in operating CCE has harmed any present or potential competition in the relevant market. Absent such facts, the Court simply cannot find that Plaintiffs have alleged any plausible antitrust claims against Defendants.

In light of Plaintiffs' three failed opportunities to plead their antitrust claims against Defendants, the Court hereby **DISMISSES** Plaintiffs' first, second, and third claims for violations of the antitrust laws **WITH PREJUDICE**. *See AE ex rel. Hernandez v. County of Tulare*, 666 F.3d 631, 636 (9th Cir. 2012) ("A district court abuses its discretion by denying leave to amend unless amendment would be futile.").

**B. Violation of the Lanham Act**

In addition to their antitrust claims, Plaintiffs allege that Defendant David Hall made false advertisements on the CCE trading website in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). (SAC ¶¶ 241–59.) The two statements at issue are (1) "that rare coins graded by PCGS, one of Hall's companies and a company owned by CU, are valued accurately and impartially" (SAC ¶ 243); and (2) "that rare coin dealers can become members on CCE (a company of Hall's) if they meet the CCE membership requirements" (SAC ¶ 254). Defendants primarily contend that Plaintiffs have no standing to bring their Lanham Act claim because the statements concern the partiality of grading services by PCGS and the membership requirements for CCE—neither of which are named as defendants in Plaintiffs' Lanham Act claim. (Mot. 15.)

In a false advertising suit, "a plaintiff establishes Article III injury if some consumers who bought the defendant's product under a mistaken belief fostered by the defendant would have otherwise bought the plaintiff's product." *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 825 (9th Cir. 2011) (internal quotation marks and alterations omitted). In addition to Article III standing, a plaintiff suing for false advertising under the Lanham Act must also have Lanham Act standing. To establish Lanham Act standing, a plaintiff must demonstrate that the false statement caused a "competitive" commercial injury. *Id.* at 826 (quoting *Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1037 (9th Cir. 2005)). In other words, the injury must hinder or be likely to hinder the plaintiff's ability to compete with the defendant. *Id.*

Analysis of the SAC demonstrates that Plaintiffs lack standing to bring their Lanham Act claim *against Hall*. Curiously, Plaintiffs persist in alleging a Lanham Act only against Hall, Plaintiffs' "direct commercial competitor . . . in the numismatic materials business." (SAC ¶ 242.) But while portions of Plaintiffs' SAC ascribe the false statements to Hall ("Hall . . . made false advertisements on the CCE trading

website" (SAC ¶ 242)), other portions suggest that the false statements are more properly attributable to PCGS and CCE, not Hall. For example, paragraph 247 notes that *PCGS* "is permanently restrained and enjoined from representing, directly or by implication, that PCGS grading is 'objective' . . . if such representation is contrary to fact." Moreover, that Hall owns PCGS and CCE is not to say that *he* made the false statements. Plaintiffs' own SAC alleges that CCE and PCGS are separate entities (CCE a Delaware corporation, and PCGS a division of Collectors Universe, also a Delaware corporation), even if Hall does own and operate them to some degree.

Because the false misrepresentations Plaintiffs complain of are more properly attributable to PCGS and CCE, Plaintiffs must allege that the misrepresentations have hindered their ability to compete with PCGS and CCE. But Plaintiffs have not alleged their Lanham Act claim against PCGS or CCE, nor have they alleged that they provide coin grading services that compete with PCGS or an online trading platform that competes with CCE. The Court therefore finds that Plaintiffs again fail to establish standing to bring their Lanham Act claim against Hall (or PCGS or CCE, for that matter). Given Plaintiffs' repeated failure to cure their pleading deficiencies with respect to this claim, Plaintiffs' Lanham Claim is hereby **DISMISSED WITH PREJUDICE**.

**C. California State-Law Claims**

To supplement the foregoing federal claims, Plaintiffs allege several state-law claims for (1) unfair competition; (2) intentional interference with prospective economic advantage; and (3) negligent interference with prospective economic advantage. But because the Court has dismissed all of Plaintiffs' federal claims with prejudice, the Court currently lacks federal-question jurisdiction. The Court therefore declines to exercise supplemental jurisdiction over the remaining state law-claims pursuant to 28 U.S.C. § 1367(c)(3). *Ove v. Gwinn*, 264 F.3d 817, 826 (9th Cir. 2001) ("A court may decline to exercise supplemental jurisdiction over state-law claims once it has dismissed all claims over which it has original jurisdiction."); *see also San*

*Pedro Hotel Co. v. City of L.A.*, 159 F.3d 470, 478 (9th Cir. 1998) (district courts not required to provide explanation when declining jurisdiction under 28 U.S.C. § 1367(c)(3)).

## V. CONCLUSION

For the above reasons, Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint (ECF No. 50) is **GRANTED**. This action is hereby **DISMISSED WITH PREJUDICE**. The Clerk of Court shall close this case.

**IT IS SO ORDERED.**

December 18, 2012

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**